D. Maimon Kirschenbaum
Lucas C. Buzzard
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, New York 10004
Tel: (212) 688-5640
Fax: (212) 688-2548

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x

| | |
|---|---|
| **ARTHUR SMITH,** | |
| Plaintiff, | Docket No.: |
| v. | **COMPLAINT** |
| **HERITAGE HEALTH & HOUSING, INC.,** | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

-----------------------------------------------------------x

Plaintiff Arthur Smith, alleges as follows:

## SUMMARY OF CLAIMS

Harlem-based Heritage Health & Housing, Inc. ("Heritage") is a nonprofit organization that provides health care and housing services to members of the Harlem community. It receives millions of dollars in grants each year from both the United States Government and the Government of the State of New York. These public funds are supposed to be used by Heritage to support its community-based services to low income households. Instead, facilitated by cronyism at the organization's highest levels, Heritage has diverted tens of thousands of these public dollars to pad the pockets of members of Heritage's Board of Directors and Executive Staff.

Saundra Alexander, a former member of Heritage's Board and the organization's interim CEO since October 2016, personifies this practice. From her perch on the Board of Directors, she swooped in to claim the vacant interim CEO position – with an annual salary of nearly $200,000

1

funded by the U.S. Health Resources and Services Administration ("HRSA") – without complying with the requirements imposed by HRSA for such transfers between the Board and the Executive Staff.  When HRSA questioned Heritage about the propriety of this move and threatened to withhold Ms. Alexander's salary, the then-Chairperson of the Board, Dr. David Rosenthal of Columbia University, ordered the Plaintiff in this case to retroactively create and then backdate the required transfer documents to make it appear to HRSA that the transfer had been proper all along.

Although Plaintiff refused to create the fraudulent documents, Ms. Alexander was nonetheless fully installed as interim CEO after Heritage (presumably) had them created and submitted to HRSA.  Ms. Alexander also ordered Heritage staff to write off tens of thousands of personal dental expenses she had incurred at Heritage's health center.  In the face of ongoing investigations into Heritage's finances and management practices by the State and Federal authorities, Ms. Alexander offloaded the vast majority of her responsibilities to Mr. Smith, going so far as to order him to perform such mundane tasks as answering emails sent to her account to make it appear that she was the author.

In November 2017, Mr. Smith complained about Ms. Alexander's practices to a member of the Heritage's Board of Directors, warning the Board member that Ms. Alexander was putting Heritage in jeopardy with both the State and Federal Governments.  He was summarily fired the next day.

## JURISDICTION AND VENUE

1. This Court has original federal question jurisdiction over under 28 U.S.C. § 1331 over Plaintiff's federal claims brought pursuant to the False Claims Act, 31 U.S.C. § 3729.  This Court has supplemental jurisdiction over the New York state law claims, as they are so related to

the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2. Venue is proper in this District because Defendant conducts business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

**PARTIES**

3. Defendant Heritage Health & Housing, Inc. ("Heritage") is a New York not-for-profit corporation that provides health care and housing services to members of the Harlem community.

4. Heritage is managed by a nine-member Board of Directors (the "Board"), which is responsible for, *inter alia*, hiring and evaluating the organization's Chief Executive Officer ("CEO").

5. Heritage is primarily funded by Federal and State grants and patient service revenues.

6. From at least 2015 to the present, Heritage has received annual grants of from the U.S. Health Resources & Services Administration ("HRSA"). One such grant is HRSA Grant Number H80CS11285.

7. In 2015, 2016, and 2017, Heritage successfully applied to HRSA for a continuation of the funding under Grant Number H80CS11285. Heritage requested these funds for the purpose of providing "uninterrupted primary care services," including "primary medical care, dental services, and behavioral health care."

8. In connection with each of its applications for continuation of Grant Number H80CS11285, Heritage was required to complete and submit HRSA Form SF-424.

9. This HRSA funding is for use on the health care side of HRSA's operations.

10. This includes the operation of the Heritage Healthcare Center (the "Heritage Center"), a Federally Qualified Health Center that receives grant funding from HRSA pursuant to Section 330 of the Public Health Service Act.

11. The Healthcare Center provides medical services to low-income community residents, including primary care and dental services.

12. Heritage also receives funding in the form of grants from the New York State Office of Mental Health ("OMH").

13. Upon information and belief, from July 2016 to July 2017, Heritage received in excess of $7 million from OMH.

14. The funding received from OMH was to be used primarily for the housing side of Heritage's operations.

15. Heritage also receives funding from the New York City Department of Homeless Services and the New York City Department of Health and Mental Hygiene.

16. Plaintiff Arthur Smith was employed as Heritage's Information Technology ("IT") Director from approximately October 2009 to November 3, 2017, when Heritage terminated his employment.

17. When Plaintiff was first hired, his position at Heritage was primarily funded by grants received solely from HRSA because his position was primarily based at the Health Center, which was funded by HRSA.

18. Heritage employed other individuals in IT positions who provided services similar to Plaintiff's for the housing side of the Heritage organization, which was primarily funded by OMH.

4

19. Beginning in approximately 2010, Heritage shifted the funding of Plaintiff's position from HRSA to OMH. Plaintiff's job duties did not change after this shift—he continued to be primarily based out of the Health Center.

20. From 2010 until the time of his termination, Plaintiff repeatedly questioned this arrangement. Plaintiff informed his supervisors on numerous occasions that the allocation of his position to be funded by OMH was improper because his position was primarily based out of the Health Center, not the housing side of the organization.

21. Defendant ignored Plaintiff's concerns.

## FACTS

22. Heritage has a long history of documented mismanagement.

23. In approximately October 2016, Heritage's then-CEO, Alvaro Simmons, resigned after a whistleblower revealed that he had misrepresented that he had a doctorate degree.

24. At the time of Mr. Simmons's resignation, Saundra Alexander was a member of Heritage's Board, serving as its Treasurer.

25. Immediately upon Mr. Simmons's termination, Ms. Alexander announced that she would be taking over as interim CEO.

26. Before taking over as interim CEO, Ms. Alexander did not formally resign her position as Treasurer of the Board of Directors, as required by HRSA as a condition of its funding.

27. Upon information and belief, Ms. Alexander was never formally nominated to serve as interim CEO before she took over the position and the Board never formally approved or voted on her assumption of that position before she took control.

28. Compliance with both of these procedures was required by HRSA as a condition of its funding of Ms. Alexander's position through the grants that had been awarded to Heritage, including Grant Number H80CS11285.

29. As interim CEO, Ms. Alexander received an annual salary of approximately $200,000, which was funded primarily by HRSA and OMH.

30. Upon information and belief, the amount of the interim CEO salary was set by the Board while Ms. Alexander sat as Treasurer.

31. In approximately April 2017, Heritage was contacted by a HRSA representative who informed the organization that before Ms. Alexander could receive compensation from HRSA under Grant Number H80CS11285, Heritage was required to submit: (1) Ms. Alexander's official resignation document as a member of the Board; and (2) the Board minutes from the meeting at which she had been approved as interim CEO.

32. After receiving this communication, then-Board Chairperson Dr. David Rosenthal, an Associate Professor of Health Policy and Management at Columbia University, asked Plaintiff to produce the requested resignation documents and Board minutes, and then back date them to October 2016, when Ms. Alexander actually took over the position of interim CEO.

33. Plaintiff refused to create the fake documents, warning Dr. Rosenthal that doing so would violate HRSA protocols.

34. Upon information and belief, Dr. Rosenthal and/or Ms. Alexander (or someone acting on their behalf) created the fake documents and back dated them. Heritage then had the documents submitted them to HRSA with the intent of obtaining Ms. Alexander's HRSA-funded salary.

35. Throughout her tenure as a Board member and interim CEO, Ms. Alexander regularly made use of the services provided by the Healthcare Center, most notably its dental services.

36. Following each visit, Ms. Alexander instructed the Healthcare Center to bill her for the services provided.

37. Ms. Alexander never paid these bills—she instead ordered Healthcare Center staff to periodically reduce her balance to zero.

38. All told, Ms. Alexander received over $20,000 worth of dental and medical services from the Healthcare Center free of charge.

39. While she was interim CEO, Ms. Alexander offloaded most of her actual responsibilities to Plaintiff and other staff members.

40. Throughout her tenure as interim CEO, Ms. Alexander refused to participate in many of the core responsibilities of that position.

41. For example, to maintain its standing with the City, State, and Federal governments, Heritage is required to hold staff meetings on certain subjects several times per month. Ms. Alexander completely abdicated her responsibilities to organize and lead these required meetings, despite numerous warnings from Plaintiff and other staff members that the failure to hold these meetings would place Heritage in jeopardy of losing its funding.

42. Ms. Alexander also refused to answer questions and requests posed by State and Federal officials. Instead, she ordered Plaintiff to respond on her behalf, often requiring him to send emails from her account as if they were sent from her.

43. In the summer and fall of 2017, Ms. Alexander's mismanagement and malfeasance began to attract the attention of the State and Federal authorities.

44. In May 2017, New York's OMH sent a letter to Heritage in which it stated that the fiscal mismanagement and incompetence on the part of Heritage's Board and Executive Staff, made it "impossible for OMH to have any reasonable assurance that Heritage can continue to manage its operations." As a result, OMH discontinued its funding of Heritage and began to transition the services Heritage provided to a different organization.

45. In September and early October 2017, Heritage laid off numerous employees on the housing side of the organization due to the loss of OMH funding.

46. Contemporaneously with these layoffs, and after the OMH funding was cut, Heritage gave Plaintiff a $3,000 raise.

47. In the summer of 2017, HRSA began an audit of Heritage's financials.

48. During that audit, HRSA examined financial records from the Healthcare Center. Plaintiff continually warned Ms. Alexander during this period that the HRSA auditors would question why she had unpaid bills for dental work performed at the Healthcare Center and pressed her to rectify the situation.

49. As Plaintiff had predicted, following the audit HRSA questioned why there had been no payment on Ms. Alexander's then-existing dental bills from the Healthcare Center, which totaled approximately $5,000.

50. On November 2, 2017, concerned that Ms. Alexander was ignoring his warnings, Plaintiff relayed his concerns to Dr. Noel Weeks, the new Treasurer of the Board of Directors. Plaintiff informed Dr. Weeks that Ms. Alexander had previously erased thousands of dollars of bills she owed the Health Center for her personal dental care. He also informed Dr. Weeks of HRSA's post-audit questions about Ms. Alexander's then-existing $5,000 dental bill. Plaintiff

expressed his belief that, if HRSA discovered the prior write offs, it would pull its funding from Heritage.

51. Upon information and belief, Dr. Weeks confronted Ms. Alexander about these issues on November 2, after meeting with Plaintiff.

52. On November 3, 2017, the day after Plaintiff complained to Dr. Weeks, Ms. Alexander summarily terminated his employment, effective that day.

53. In the termination meeting, Ms. Alexander told Plaintiff that he was being terminated for financial reasons due to the loss of funding from OMH.

54. This rationale for Plaintiff's termination is inconsistent with the $3,000 raise Plaintiff received just months earlier, after OMH had cut its funding.

55. Furthermore, Plaintiff's position was supposed to be primarily funded by HRSA, meaning that the loss of OMH funding should have had little to no effect on the financing of his position.

56. To the extent the majority of Plaintiff's position was funded by OMH, that arrangement was improper, as Plaintiff had repeatedly informed his supervisors. Plaintiff's position was supposed to be primarily funded by HRSA, as his responsibilities were primarily geared toward the Health Center (which was primarily funded by HRSA), not the housing aspect of Heritage's operations (which were primarily funded by OMH).

57. After Plaintiff was terminated, Ms. Alexander ordered the Healthcare Center to write off the $5,000 dental bill that HRSA had questioned during its audit.

58. When Plaintiff complained to members of the Board about his termination, he was informed by Dr. Adrienne Thomas—the new Chairperson and Ms. Alexander's close personal

friend and neighbor—that the Board's bylaws "prohibit" the Board from interviewing or speaking with employees concerning their complaints about the interim CEO.

59. This is false. Nothing in the bylaws prohibits the Board from speaking with employees about their concerns. Quite the contrary. The bylaws vest the Board with authority to "exercise all powers . . . and do all lawful acts and things necessary or appropriate to carry out the mission" of Heritage, including "evaluat[ing]" the CEO and "provid[ing] oversight of the Corporation's performance and finances."

60. Upon information and belief, in early December 2017, Heritage hired another individual to perform Plaintiff's duties, despite their claims that his position could no longer be funded.

## FIRST CLAIM FOR RELIEF
### (Retaliation in Violation of the False Claims Act, 31 U.S.C. § 3730(h))

61. Plaintiff realleges and incorporates by reference all previous paragraphs.

62. The False Claims Act ("FCA") imposes liability on any person who: (1) knowingly presents or causes to be presented a "false or fraudulent claim for payment or approval" by the federal government; (2) knowingly "makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; (3) knowingly "makes, uses, or causes to be used, a false record or statement material to an obligation to pay or transmit money or property to the Government"; (4) knowingly "conceals or . . . improperly avoids or decreases an obligation to pay or transmit money or property to the Government"; or (5) "conspires" to commit any of the above acts. 31 U.S.C. § 3729(a)(1).

63. The FCA anti-retaliation provision prohibits an employer from discriminating in any manner against an employee because of his "efforts to stop 1 or more violations of" the FCA. 31 U.S.C. § 3730(h).

64. Here, Plaintiff reasonably and in good faith believed that the creation of false documents to submit to HRSA to obtain funding and the writing off of Ms. Alexander's dental and medical bills to the Healthcare Center, constitute violations of the FCA, 31 U.S.C. § 3729(a)(1).

65. Plaintiff engaged in protected activity under the FCA when he attempted to put a stop to these illegal practices by reporting them to his superiors.

66. Defendant's reprisal against Plaintiff by terminating his employment the day after he complained about these practices, constitutes illegal retaliation for Plaintiff's protected activity under the FCA.

67. Defendant's conduct was intentional, deliberate, willful, and conducted in callous disregard for Plaintiff's protected rights.

68. As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered and will continue to suffer harm, and is entitled to all equitable and legal remedies available under the FCA, law including, but not limited to, reinstatement, restoration of benefits, an award of two times the amount of back pay, front pay, compensatory damages for emotional distress, punitive damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

### SECOND CLAIM FOR RELIEF
### (Retaliation in Violation of the New York False Claims Act, N.Y. State Finance Law § 191)

69. The New York False Claims Act ("NYFCA") imposes liability on any person who: (1) knowingly presents or causes to be presented a "false or fraudulent claim for payment or approval" by the state or a local government; (2) knowingly "makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; (3) knowingly "makes, uses, or causes to be used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government"; (4) knowingly "conceals or . . . improperly

11

avoids or decreases an obligation to pay or transmit money or property to the state or a local government"; or (5) "conspires" to commit any of the above acts. N.Y. State Fin. Law § 189(1).

70. The NYFCA anti-retaliation provision prohibits an employer from discriminating in any manner against an employee because of his "efforts to stop one or more violations of" the NYFCA. N.Y. State Fin. Law § 191(1).

71. Here, Plaintiff reasonably and in good faith believed that the creation of false documents to obtain funding, and the writing off of Ms. Alexander's dental and medical bills to the Healthcare Center, constitute violations of the NYFCA, N.Y. State Fin. Law § 189(1).

72. Plaintiff engaged in protected activity under the NYFCA when he attempted to put a stop to these illegal practices by reporting them to his superiors.

73. Defendant's reprisal against Plaintiff by terminating his employment the day after he complained about these practices, constitutes illegal retaliation for Plaintiff's protected activity under the NYFCA.

74. Defendant's conduct was intentional deliberate, willful, and conducted in callous disregard for Plaintiff's protected rights.

75. As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered and will continue to suffer harm, and is entitled to all equitable and legal remedies available under the NYFCA, law including, but not limited to, reinstatement, restoration of benefits, an award of two times the amount of back pay, front pay, compensatory damages for emotional distress, punitive damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

(A)     For compensatory and punitive damages in an amount to be determined by the trier of fact;

(B)     For reasonable attorneys' fees, interest, and costs of suit;

(C)     For such other and further relief as the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which has a right to jury trial.

Dated: New York, New York
      February 20, 2017

Respectfully submitted,
JOSEPH & KIRSCHENBAUM LLP

By:  _D. Maimon Kirschenbaum_____
     D. Maimon Kirschenbaum
     Lucas C. Buzzard
     32 Broadway, Suite 601
     New York, NY 10004
     Tel: (212) 688-5640
     Fax: (212) 688-2548